Carlisle v. Cooper.

CARLISLE and others, appellants, and COOPER, respondent.

COOPER, appellant, and CARLISLE and others, respondents.

1. The jurisdiction of courts of equity over the subject matter of nuisances, is not an original jurisdiction. It does not arise from the fact that a nuisance exists, but results from the circumstance that the equitable power of the court is necessary to protect the party from an injury for which no adequate redress can be obtained by an action at law, or its interference is necessary to suppress interminable litigation for the recovery of damages for an actionable wrong. As a condition to the exercise of that power it is essential that the right shall be clearly established, or that it should previously have been determined by the action of the ordinary tribunals for the adjudication of the rights of the parties, and the injury must be such in its nature or extent, as to call for the interposition of a court of equity.

2. The rule of the English law requiring the complainant's legal rights to be first established in a court of law, before a court of equity will give relief in cases of nuisance, has been somewhat relaxed. The mere denial of the complainant's right by the defendant in his answer, will not oust the court of its jurisdiction by injunction. So also when the complainant has for a long time been in the undisputed possession of the property or enjoyment of the right with respect to which he complains, and the acts of the defendant which constitute the injury to such property, or the invasion of such right, have been done recently before the filing of the bill, the Court of Chancery will entertain jurisdiction to decide and dispose of the entire litigation, if the evidence does not raise any serious question as to the fact of the existence of the complainant's rights when the bill is filed.

3. Where a complainant seeks protection in the enjoyment of a natural watercourse upon his land, the right will ordinarily be regarded as clear. The mere fact that the defendant denies the right by his answer, or sets up title in himself by adverse user, will not entitle him to an issue before the allowance of an injunction.

4. Where complainant's lands are rendered comparatively worthless by backwater from a dam, and a nuisance is thereby created deleterious to health, and the enjoyment of the premises is thereby impaired, an action of law furnishes no adequate remedy, and the complainant is entitled to the protection of a court of equity by the abatement of the nuisance.

5. Where the complainant's right to the relief sought by the bill is admitted by the answer, and also established in a suit at law, and the sole question of fact in controversy is, whether the defendant has effected an abatement of the admitted nuisance by lowering his dam to the required level, a court of equity is an appropriate tribunal to decide that question.

There is nothing in the subject matter of such investigation that would entitle the defendant to an issue as of course.

6. The granting or refusing of an issue is a matter of discretion.

7. The power of courts of equity to order the trial of an issue of fact which the court is itself competent to try, ought to be sparingly exercised, and a practice of sending ordinary matters to the decision of a jury ought not to be established. Where the truth of facts can be satisfactorily ascertained by the court, without the aid of a jury, it is its duty to decide as to the facts, and not subject the parties to the expense and delay of a trial at law.

8. Mere delay in applying to the court is frequently a ground for denying a preliminary injunction, and is also a reason for courts of equity refusing to take cognizance of a case where there is a remedy at law. But where the legal right is settled, and the more efficacious remedy of a court of equity is necessary to complete relief, delay is no ground for a denial of its aid, unless it is coupled with such acquiescence as deprives the party of all right to equitable relief.

9. A person may so encourage a nuisance as not only to be deprived of the right to equitable relief, but also to give the adverse party an equity to restrain him from recovering damages at law for such nuisance. But where a defendant expended money in erecting a dam, and increasing the capacity of his mill, under a verbal agreement with the owner of lands above for the privilege of overflowing his lands for a compensation to be made, and filed a bill after the work was completed for the specific performance of that agreement, and was denied relief, he will be concluded by the decree in that case, and cannot rely on such alleged agreement as a ground for denying relief, on a bill subsequently filed by such owner to enjoin the overflow of his lands and to obtain an abatement of the dam.

10. Where, as the facts were upon the filing of the bill, the complainant was entitled to relief in a court of equity, the defendant cannot defeat complete redress by a partial abatement of the nuisance, upon an insistment that the effects of such portion of the nuisance as still remain, are not of sufficient consequence to entitle the complainant to ask that perfect relief which he was entitled to when he sought his remedy.

11. The extent of the right to flow the lands of another acquired by adverse user, is not determined by the height of the structure of the dam, but is commensurate with the actual enjoyment of the easement, as evidenced by the extent to which the land of the owner of the servient tenement was habitually or usually flowed during the period of prescription.

12. As a general rule, the height of the dam when in good repair and condition, including such parts and appendages as make its efficient height in its ordinary action and operation, fixes the extent of the right to flow, without regard to fluctuations in the flowage which are due to accidental causes, such as a want of the usual repairs, or the variation in the quantity

of water in the stream in times of low water or drought, or in the pondage of the dam by its being drawn down by use.

13. There may be such continuity of use of flash boards as that they, in effect, are parts of the permanent structure, and by such user a right to flow by means of a permanent dam to the height of such boards may be acquired, but the occasional use of flash boards for short periods, when little or no injury may be done, as an exception to the general rule not to keep them on, does not amount to the open, uninterrupted, and notorious adverse use necessary to establish a prescriptive right.

14. Prescriptions may be upon condition in restraint of the mode in which the prescriptive right is to be enjoyed, or may have annexed to them a duty to be performed for the benefit of the person against whom the prescription exists.

15. The prescriptive right to the use or flow of water may be qualified as to times, seasons, and mode of enjoyment, by the character of the use from which the right has originated.

16. Where the practice in the use of a dam and its appendages during the period of prescription, has been to control the height of the water in the pond in times of high water by removing the gates and permitting the water to flow off, this mode of user qualifies the right which has been acquired by prescription, and a decree permitting the use of such gates, which requires that they shall be removed in times of freshets and high water, is necessary to restrain the flowage of the complainant's lands to what it was accustomed to be during the time of prescription.

17. A decree which refers to the cap piece of the dam, as fixing the extreme height to which the water may be raised by the use of the gates when shut, though more specific in its direction than is usual, is not objectionable for that reason.

----

The bill was filed by Eliza Carlisle and others, to ascertain and settle the height at which the defendant, Cooper, was entitled to maintain his dam; and to enjoin the defendant from overflowing the complainants' lands with backwater from the dam of the defendant. The facts of the case sufficiently appear in the opinion of the Chancellor, reported in 4 *C. E. Green* 257.

Both parties appealed from the Chancellor's decree, and the appeals were argued together.

*Mr. Pitney,* for Carlisle and others.

*Mr. Vanatta* and *Mr. Shipman,* for Cooper.

The opinion of the court was delivered by

DEPUE, J.

The counsel of the defendant, as a preliminary matter, submitted to the court the question, whether the Court of Chancery has jurisdiction to try the question of nuisance or no nuisance, involved in this cause.

Upon the abstract question, whether a court of equity has jurisdiction over nuisances, whether they come within the class of public or of private nuisances, very little need be said. Whatever contention there is at the bar, or disagreement among judicial minds, as to the principles on which that jurisdiction should be administered, there is no room for controversy that such jurisdiction pertains to courts of equity. It is a settled principle that courts of equity have concurrent jurisdiction with courts of law in cases of private nuisances; the interference of the former in any particular case being justified, on the ground of restraining irreparable mischief, or of suppressing interminable litigation, or of preventing multiplicity of suits. *Angell on Watercourses,* § 444; 2 *Story's Eq. Jur.,* § 925; *The Society* v. *The Morris Canal Co., Saxt.* 157; *Scudder* v. *Trenton Del. Falls Co., Saxt.* 694; *Burnham* v. *Kempton,* 44 *New Hamp. R.* 79.

The doctrine of the English courts is, that the jurisdiction of courts of equity over nuisances, not being an original jurisdiction for the purpose of trying a question of nuisance, but being merely a jurisdiction in aid of the legal right for the purpose of preserving and protecting property from injury pending the trial of the right, or of giving effect to such legal right when it has been established in the appropriate tribunal, the court will not, as a general rule, entertain jurisdiction to finally dispose of the case, where the right has not been previously established and is in any doubt, and the defendant disputes the right of the complainant or denies the fact of its violation. Under such circumstances the court will, ordinarily, do nothing more than preserve the property in its present condition, if that be

necessary, until the question of right can be settled at law. *Semple* v. *The London and Birmingham R. R. Co.* 1 *Eng. Rail. Cas.* 120; *Blakemore* v. *The Glamorganshire Canal Navigation*, 1 *Myl. & Keen.* 154; *Broadbent* v. *Imperial Gas Co.*, 7 *DeG. M. & G.* 436; *S. C., on Appeal*, 7 *H. of L. Cases* 600; *Elmhirst* v. *Spencer*, 2 *Mac. & G.* 45; *Kerr on Injunctions* 332, 340; 2 *Story's Eq.*, § 925 *b*; *Angel on Watercourses*, § 452.

It is said in the ninth edition of Story on Equity Jurisprudence, that in the American courts the rule of the English law requiring the complainant's legal rights to be first established in a court of law before a court of equity will give relief, has, in general, not been enforced in its strictness. 2 *Story's Eq.*, § 925 *d*. In our own state it has been somewhat relaxed. The mere denial of the complainant's right by the defendant in his answer, will not oust the court of its jurisdiction by injunction. *Shields* v. *Arndt*, 3 *Green's Ch.* 235; *Holsman* v. *Boiling Spring Bleaching Co.*, 1 *McCarter* 335. So also, when the complainant has for a long time been in the undisputed possession of the property or enjoyment of the right with respect to which he complains, and the acts of the defendant which constitute the injury to such property or the invasion of such right, have been done recently before the filing of the bill, the Court of Chancery has entertained jurisdiction to decide and dispose of the entire litigation. The language of Chancellor Pennington on this subject in *Shields* v. *Arndt*, has been very generally approved, and 'the principle he states has been adopted by the courts of this state. He says: " It was not so much against the general jurisdiction of the court that the objection is raised, as to its exercise when the defendant, as in this case, denies the complainant's right. It is the province of this court, as the defendant's counsel insist, not to try this right, that belonging alone to a court of law, but to grant the possession whenever that right has been ascertained and settled. If it be intended to say that a defendant setting up this right by his answer, thereby at

once ousts this court of jurisdiction, I cannot assent to it, for it would put an end very much to the exercise of an important branch of the powers of the court. . . . If it be intended to go no further than that it is a question which should be sent to law in cases of doubt, and often should, before injunction, be first there established by trial and judgment, then I agree to the proposition. A long enjoyment by a party of a right, will entitle him to restrain a private nuisance, even though the defendant may deny the right, and the court will exercise its discretion whether to order a trial at law or not, always inclining to put the case to a jury if there be reasonable doubt."

The decree in that case was against the complainant, on the ground that he had not established by the proofs in the cause his right to the stream in question, as an ancient watercourse. On appeal to the senate, sitting as a court of appeal, the decree was reversed by a vote of eleven to seven, and a perpetual injunction was decreed. *Minutes of Court of Errors and Appeals, June 19th*, 1844.

In *Shields* v. *Arndt*, the complainant had been in the enjoyment of the flow of water upon his land without interruption, until just before the bill was filed. In the other cases in which chancery has granted relief on final decree, by injunction, the complainant was either in the full enjoyment of the right, which was protected from threatened invasion, when the bill was filed, or his right originally was not disputed, and its continued existence was clearly established at the hearing, and the act of the defendant, which interrupted the enjoyment of it, had been done within a recent period before the bill was filed. *Robeson* v. *Pittenger*, 1 *Green's Ch.* 57; *Brakely* v. *Sharp*, 2 *Stockt.* 206; *Earl* v. *De Hart*, 1 *Beas.* 280; *Holsman* v. *Boiling Spring Bleaching Co.*, 1 *McCarter* 335; *Del. and R. Canal Co.* v. *Raritan and Del. Bay R. R. Co.*, 1 *C. E. Green* 321; *S. C., on Appeal*, 3 *C. E. Green* 546; *Morris Canal and Banking Co.* v. *Central R. R. Co.*, 1 *C. E. Green* 419.

In *Holsman* v. *The Boiling Spring Bleaching Company*,

the bill was filed to enjoin the defendants from polluting a stream, which flowed in its accustomed channel through the lands of the complainants. The defendants were incorporated in the year 1859, for the purpose of carrying on the business of bleaching and finishing cotton and woollen goods, and soon after became the owners of a tract of land, pond, and mill premises above the lands of the complainants, and erected thereon a large mill and works, which were put in operation in the summer of 1860. The bill charged, that in the fall of 1860, in consequence of large quantities of chemical matter and other impurities discharged from the defendants' works into the stream, the water was filled with offensive matter, discolored and polluted, and rendered unfit for domestic purposes, producing offensive odors, which infected the air of the neighborhood, and penetrated the dwelling, so that the complainants were compelled to refrain from all use of the water for family or other purposes; by reason whereof, they were unable to use or enjoy their said property as they had been accustomed, and of right ought to do, or to sell the same at a fair price. The bill was filed on the 5th day of February, 1861. The defendants in their answer did not deny the erection of their works, or the discharge of chemicals and other matter therefrom into the stream, but insisted that the nuisances of which the complainants complained were not occasioned thereby, but by other causes. They further alleged that the lands and mill site used and occupied by them, had been used and occupied as a mill site for more than twenty years, and that the business of fulling and dyeing had been there carried on for more than that period of time, and that they had thereby required a prescriptive right to use said stream for manufacturing purposes, although the same might taint and discolor the water. The cause was brought to a hearing on the pleadings and evidence, and the Chancellor decreed a perpetual injunction. That the water in the stream upon the complainants' land had, since the erection of the defendants' works, become discolored, polluted, and unfit for domestic or

ornamental purposes, and that the complainants' premises had thereby been rendered uncomfortable, inconvenient, and undesirable, for the purposes for which they were designed and used, were not denied by the answer, and were fully established by the evidence. The Chancellor decided, that where a complainant seeks protection in the enjoyment of a natural watercourse upon his land, the right will ordinarily be regarded as clear, and that the mere fact that the defendant denies the right by his answer or sets up title in himself by adverse user, will not entitle him to an issue before the allowance of an injunction. With respect to the defendants' claim of a prescriptive right to pollute the waters along the complainants' lands, he examined the evidence, and found that although the mill site occupied by the defendants may have been used for the purpose of dyeing for the period of twenty years, there was no evidence in the cause that the materials discharged into the stream, anterior to the erection of the defendants' works, were such in character or quantity as to pollute the waters in front of the complainants' lands, and that consequently there was no proof whatever of any adverse user in the defendants, or those under whom they claimed. In this aspect of the evidence touching the adverse right set up by the defendants, this case, like those which preceded it, is an illustration of the practice of the courts of equity of this state to take complete cognizance of matters of nuisance, where the complainant has previously been in the undisputed enjoyment of a right, and the bill is filed promptly upon the commission of the act of interference with such right, and the evidence does not raise any serious question as to the fact of the existence of the complainants' right when the bill is filed. That it was not intended to assert the power of the Court of Chancery to ultimately dispose of questions of nuisance, without regard to the state of the evidence bearing on the question as to the existence of the complainants' right, and the situation of the parties previous to the filing of the bill, is shown by the remarks of the Chancellor in his opinion as

to the necessity that the party's right should be clear to entitle him to the remedy by injunction in cases of private nuisance, as well as by the opinion of the same Chancellor, in the case of the *Zinc Co.* v. *The N. J. Franklinite Co.*, *2 Beas.* 322, in which he expresses his repugnance to deciding a question of right in real property, where the defendant was in possession, and a real controversy arose as to the superiority of the titles of the respective parties, a repugnance which was only overcome by the fact that no motion had been made to dissolve the preliminary injunction, and that both parties were desirous that the question of the rights of the parties should be decided. The same doctrine has repeatedly been enunciated by the courts of this state, as the controlling principle by which the Court of Chancery is guided in exercising its undoubted jurisdiction over the subject of private nuisances. *Scudder* v. *The Trenton Delaware Falls Co., Saxt.* 694; *Southard* v. *The Morris Canal Co., Id.* 519; *Shreve* v. *Voorhees*, 2 *Green's Ch.* 25; *Outcalt* v. *Disborough, Id.* 214; *Hulme* v. *Shreve*, 3 *Green's Ch.* 116; *Shreve* v. *Black, Id.* 177; *Cornelius* v. *Post*, 1 *Stockt.* 196; *Wolcott* v. *Melick*, 3 *Stockt.* 204; *Haight* v. *The Morris Aqueduct Proprietors*, 4 *Wash. C. C.* 601.

The principle supported by these cases was not impaired by the decision of this court, in *The Morris and Essex R. Co.* v. *Prudden*, 5 *C. E. Green* 530. In that case the appeal was from an order of the. Chancellor for a preliminary injunction, on depositions taken under a rule to show cause. The premises on which the defendants were about to lay their track, were within the limits of an old turnpike which had been vacated under legislative authority to enable the defendants to use a part of the same for their purposes; on the faith of which they acquired the title to the fee, and for twenty years had occupied it for a single track, and other purposes connected with their business. The right of the complainant for the protection of which the bill was filed was not all clear, and the injury on which he based his

claim to equitable relief was slight, and the injunction stopped an important public work. As already observed, the jurisdiction of courts of equity over the subject matter of nuisances is not an original jurisdiction. It does not arise from the fact that a nuisance exists, but results from the circumstance that the equitable power of the court is necessary to protect the party from an injury, for which no adequate redress can be obtained by an action at law, or its interference is necessary to suppress interminable litigation, for the recovery of damages for an actionable wrong. As a condition to the exercise of that power, it is essential that the right shall be clearly established, or that it should previously have been determined by the action of the ordinary tribunals for the adjudication of the rights of the parties, and the injury must be such, in its nature or extent, as to call for the interpositson of a court of equity.

In the case now under consideration the defendant had been in the use of his dam, as it was at the time of the filing of the bill, since 1853, unmolestsd by the complainants, or their ancestor, until 1861, when the first of the actions at law was brought. It is therefore insisted by the defendant's counsel, that the suit is prosecuted not for relief in aid of a legal right, but for establishing a legal right, the appropriate tribunal for the determination of which is a court of law. But the decisive answer to this position of counsel lies in the fact, that the right of the complainants at the time of the filing of the bill, and the invasion of those rights by the defendant, are admitted by the answer. The bill alleges the seisin of the farm in question by the complainants, and that the same bounds on Black river, which from time immemorial had been used and accustomed to flow and run by and along the said farm in its natural and accustomed channel, free and clear of all obstructions whatever, and that prior to 1846 the flow of the said river along the complainants' said farm was not in anywise affected by the defendant's dam, or the pondage thereof. The charge is, that the defendant in October or November,

1846, increased the height of his dam and its appendages, the exact amount of such increase being unknown to the complainants, and that since that time the farm of the complainants has been overflowed by water backed upon it by the defendant's dam. The bill was filed on the 17th of September, 1866. The answer was filed on the 28th of November, 1866. In it the seisin of the complainants of the farm was admitted. It was also admitted that the efficient height of the dam was increased in 1846, and that thereby the backwater on the complainants' farm was increased. The insistment was, that the increase in the height of the dam in 1846, was only nine inches, and that on the 23d of November, 1866 (two months after the filing of the bill) the defendant had reduced his dam nine inches, whereby its efficient height was made what it was before. 1846. Upon this branch of the case, the defendant put his defence on the ground that having complied with the object of the bill, there was no reason for continuing the litigation.

Furthermore, at the time of the filing of the bill, two suits at law brought by Eliza Carlisle, one of the complainants, and who was in possession, were pending against the defendant, to recover damages for injuries sustained by reason of the overflow of these lands, by the raising of the dam in 1846. One of these suits was brought in 1861, the other in 1866. These causes having been taken down for trial to the Morris circuit, at the Term of January, 1867, the defendant relinquished his plea to one of the counts of the declaration in each case, in which such injury was complained of, and confessed the cause of action, and submitted to pay substantial damages. Judgments were accordingly entered for the plaintiff in those suits on the 6th of June, 1867, transcripts whereof were made exhibits in this cause.

The extent to which the complainants were entitled to have the defendant's dam reduced, in order to effect an entire abatement of the nuisance, could not be settled by an ordinary action at law for overflowing the complainants' land. The facts necessary to fix the proper measure of such

relief could only be ascertained by the verdict of a jury, upon an issue specially framed for that purpose.

The complainants' right to such relief as is sought by the bill, being admitted by the answer, and also having been established in the suit at law, the sole question of fact in controversy was, whether the defendant had effected an abatement of the admitted nuisance by lowering his dam to its level before the increase of 1846. The inquiry necessary to decide that controversy, may be made in the Court of Chancery; at least there is nothing in the subject matter of that investigation, that, by established rules of equity procedure, would entitle the party to an issue as of course. Even in the case of an heir-at-law, who is entitled to an issue as a matter of course, when the controversy is as to the *factum* of a will, if he does not dispute the will, but merely denies that certain portions of the land passed by the words of description, a court of equity has full jurisdiction to determine the question thus raised without granting an issue, or may grant such issue at its discretion. *Ricketts* v. *Turquard*, 1 *H. of L. Cas.* 472. A court of equity has jurisdiction to ascertain and determine the rights of parties under a reservation, in a grant of a water privilege, of so much water " as is necessary for the use of a forge, and two blacksmiths' bellows," without requiring the right to be settled at law. *Olmsted* v. *Loomis*, 5 *Seld.* 423.

In *Broadbent* v. *The Imperial Gas Company*, which was before Vice Chancellor Wood (2 *Jurist N. S.* 1132), and afterwards before Lord Chancellor Cranworth, (3 *Jurist N. S.* 221, 7 *DeG., M. & G.* 436), and subsequently before the House of Lords (5 *Jurist N. S.* 1319, 7 *H. of L. Cas.* 600), the complaint was that the complainant, who was a market gardener, was injured by a nuisance arising from the manufacture of gas by the defendants, on the premises adjoining his garden. The complainant, in 1854, brought his action at law to recover damages for such nuisance. The cause came on for trial before Lord Chief Justice Jervis, and by consent was referred to Sergeant Channel to settle the amount of damage

(if any) which had been occasioned, with power to order what, if any thing, should be done between the parties. In January, 1856, the arbitrator reported the amount of damages, for which judgment was entered, but he failed to make any report as to what should be done by the defendants to obviate the injury to the plaintiff. In May, 1857, a bill was filed by Broadbent to enjoin the company from continuing the nuisance. The Vice Chancellor decreed a perpetual injunction. This decree was affirmed on appeal by Lord Chancellor Cranworth, and was sustained on appeal by the House of Lords. It appeared in evidence that after the submission in 1854, and before the date of the award, alterations had been made in the works, which, it was insisted, made the award as to the state of things in 1854 no longer conclusive as to the state of things in 1856, and the objection was taken that no relief could be obtained by injunction until the fact whether, under the existing condition of the defendants' works, a nuisance was created, was attained by the verdict of a jury. The objection was overruled. In moving the judgment of affirmance, Lord Chancellor Campbell says : "It is said that a new trial was necessary here, because there had been some alterations. That there had been some alterations after the submission, is proved. I consider that that is a point upon which it is for an equity judge to form his opinion. If there has once been a trial at law, and the plaintiff's right has been established at law, I think it is for the equity judge to determine, when the application is made for the injunction, whether the nuisance continues or whether it has been abated; and if he is of opinion that it has not been abated, but that it still continues, then it is his duty to grant an injunction. It seems to me very strange to contend that because a party who commits a nuisance chooses to make some alteration, even although he may do it *bona fide*, it is to be laid down as a rule that there must be another trial, and that *toties quoties* as often as the parties shall make any alteration there must still be another trial. I think the Vice Chancellor did well in investigating whether

the nuisance continued, and that it was quite unnecessary for him to order a second trial in order to try a fact which had been already investigated and established." Lord Kingsdown, in expressing his concurrence, is equally explicit. His language is: "I perfectly admit that if it could have been shown, upon the application for the injunction, that alterations had been made which had had the effect of removing the evil which the plaintiff had complained of in the action, he would, of course, not have obtained any injunction. But I am not at all prepared to admit that the court was bound to ascertain that fact by directing the trial of an action at law. It remained for the party who resisted that application to show that those alterations had been made which were effectual for the purpose; and if the court, upon the evidence, had reasonable doubt upon that subject, it might, for the information of its conscience, have directed a trial; but it was equally competent to it, and in my opinion it was its duty, if it saw, upon the examination of that evidence, that the evil had not been diminished, to act upon that conviction, and to grant the injunction which it actually did grant."

The case, from the opinions in which these extracts have been taken, is the same as that now before the court, except that this case is strengthened by the fact that the nuisance complained of is admitted by the answer, and the alterations which are claimed to have removed it were made after the bill was filed.

It was further urged upon the argument with much earnestness, that although it might be competent for the court to determine the question in controversy, yet that, under the circumstances of this case, an issue should have been allowed for the determination of the disputed facts by the verdict of a jury.

The power of courts of equity to order the trial of an issue of fact which the court is itself competent to try, ought to be sparingly exercised, and a practice of sending ordinary matters to the decision of a jury, ought

not to be established.  Where the truth of facts can be satisfactorily ascertained by the court without the aid of a jury, it is its duty to decide as to the facts, and not subject the parties to the expense and delay of a trial at law. But in cases where the evidence is so contradictory as to leave the decision of a question of fact in serious doubt, and superior advantages of testing the credit of witnesses by *viva voce* examination in open court, and of applying the facts and circumstances proved in the cause to the decision of disputed points, may be obtained by means of a trial before a jury, it is proper that an issue should be awarded. *Trenton Banking Co.* v. *Woodruff*, 1 *Green's Ch.* 118; *Miller* v. *Wack, Saxt.* 205; *Bassett* v. *Johnson,* 2 *Green's Ch.* 417; *Hildreth* v. *Schillinger,* 2 *Stockt.* 196; *Lucas* v. *King, Id.* 277; *Fisler* v. *Porch, Id.* 242; *Black* v. *Lamb,* 1 *Beas.* 108; *S. C.,* nomine *Black* v. *'Shreve,* 2 *Beas.* 455; 2 *Daniell's Ch. Pr.* 1086, 1285; *Short* v. *Lee,* 2 *Jac. & Walker* 465; *Dexter* v. *The Providence Aqueduct Co.* 1 *Story's R.* 387; *Dale* v. *Roosevelt,* 6 *Johns. Ch.* 255; *Hammand* v. *Fuller,* 1 *Paige* 197; *Apthorp* v. *Comstock,* 2 *Paige* 482; *Townsend* v. *Graves,* 3 *Paige* 453.

The granting or refusing an issue is a matter of discretion, and no application was made to the Chancellor for an issue. The case of *Carlisle* v. *Cooper,* 3 *C. E. Green* 241, in which the question of jurisdiction was raised, was not between these parties.  The subject matter of the controversy there, was the dam complained of in this case, but the complainant in that cause was John D. G. Carlisle, and the application to the Chancellor was not an application for a feigned issue.  In the answer in this case, the defendant, after stating the abatement of his dam nine inches, submits and insists " that if the complainants shall insist that the defendant has not reduced his dam to the height it was prior to the year 1846, and insists upon trying that question in this honorable court, that this honorable court is not the appropriate tribunal in which to try and decide that question."  A replication was filed, and the parties proceeded to

take their evidence. A court of equity is an appropriate tribunal to decide that question. The case was submitted to the Chancellor for decision on its merits, without objection to the mode of trial. The submission of it to him without applying for an issue, concludes the parties from objection now to the mode of trial. *Belknap* v. *Trimble*, 3 *Paige* 577.

The position was also taken, that the complainants had lost their right to relief by long delay. Mere delay in applying to the court is frequently a ground for denying a preliminary injunction, and is also a reason for courts of equity refusing to take cognizance of a case, where there is a remedy at law. But where the legal right is settled, and the more efficacious remedy of a court of equity is necessary to complete relief, delay is no ground for a denial of its aid, unless it is coupled with such acquiescence as deprives the party of all right to equitable relief. A person may so encourage another in the erection of a nuisance, as not only to be deprived of the right of equitable relief, but also to give the adverse party an equity to restrain him from recovering damages at law for such nuisance. *Williams* v. *Earl of Jersey*, 1 *Cr. & Ph.* 91. So a party who knowingly, though passively, encourages another to expend money under an erroneous opinion of his rights, will not be permitted to assert his title, and thereby defeat the just expectation upon which such expenditure was made. *Dann* v. *Spurrier*, 7 *Ves.* 231; *Rochdale Canal Co.* v. *King*, 2 *Sim. N. S.* 78; *S. C.*, on final hearing, 21 *Eng. L. & Eq* 178; *Ramsden* v. *Dyson*, *L. R.* 1 *H. of L.* 140; *Dawes* v. *Marshall*, 10 *C. B., N. S.*, 697; *Wendell* v. *Van Rensselaer*, 1 *Johns. Ch. R.* 354; *Ross* v. *The E. & S. R. R. Co.*, 1 *Green's Ch.* 422; *Hulme* v. *Shreve*, 3 *Green's Ch.* 116; *The Morris and Essex R. Co.* v. *Prudden*, 5 *C. E. Green* 531; *The Raritan Water Power Co.* v. *Veghte*, 6 *C. E. Green*, ante p. 463. The defendant's case is not within either of these principles. He did not make his expenditure in erecting his dam, and increasing the capacity of his mill, either

upon the encouragement of the complainants' ancestor, or under an impression that he had the right to cast the water back to the extent it was held by his dam. He knew that by so doing he would interfere with the complainants' farm. He claims that he obtained that privilege from the complainants' ancestor, under a verbal agreement that he was to be permitted to flow as much of his lands as he, the defendant, saw fit, if he paid him therefor at the same rate as the defendant paid one Horton for lands on the opposite side of the stream. Upon such alleged agreement the defendant sought his remedy after the actions at law were brought, by a bill for its specific performance, and was denied relief. *Cooper v. Carlisle*, 3 *C. E. Green* 525. The adjudication and decision of that question in that case concludes the rights of these parties.

The damages paid by the defendant in the two suits at law, amounted to $500. The injury done to the farm of the complainants by the backwater, rendered a part of their land comparatively useless, and the evidence shows that a nuisance was created on it deleterious to health, and that the enjoyment of the premises was thereby impaired. For such injuries an action at law furnishes no adequate remedy, and the party enjoined is entitled to the protection of a court of equity by abatement of the nuisance. *Holsman* v. *The Boiling Spring Bleaching Co.*, 1 *McCarter* 335; 2 *Story's Eq. Jur.*, § 926.

As the facts were when the bill was filed, the nature and extent of the injury sustained by the complainants were such as to entitle them to relief in a court of equity, and it would be an extraordinary proposition, that a defendant after the institution of the suit for such relief, should be enabled to defeat complete redress by a partial abatement of the nuisance, thus mitigating but not removing the evil, upon an insistment that the effects of such portion of the nuisance as still remained, were not of sufficient consequence to entitle the complainant to ask that perfect relief which he was entitled to when he sought his remedy.

The prayer of the bill is, that the exact amount of the increase in the height of the dam in 1846 may be ascertained, and that the defendant may be ordered and decreed to abate said dam, and reduce it to its original height, as it was prior to the year 1846, and remove the obstructions caused thereby to the flow of the river; or that the same may be abated and reduced in height under the directions of the court. The complainants are entitled to the relief prayed for.

The appeal upon the merits, raises the question whether the relief which was granted by the Chancellor, is such as is warranted by the evidence.

The exact import of the decree is, that the defendant is entitled to maintain his dam at the height of the present stone work, and the mudsill thereon, and the sheathing, with the right to place on the mudsill, for the whole length thereof, moveable gates of plank of the width of seven inches, reaching a line nine inches above the said mudsill, and no higher; and that by means of these contrivances the defendant shall be entitled to use the water of said river, subject to the obligation in times of freshets or high water, to so raise the said gates as that the surface of the water shall not be raised above a line drawn twelve and a quarter inches above the top of the mudsill.

The dam was built originally in 1827. It then consisted of a stone wall with a sill upon it, and was about thirty-six feet long. In 1828 or 1829, the superstructure was increased by the addition of posts twelve inches long, with a cap piece on the top nine inches wide. The space between the cap piece and the sill, at each end, was boarded up tight. The rest of the space was occupied by gates nine or ten inches wide, leaving a space between the top of these gates and the underside of the cap, through which the water flowed under the cap piece. In 1846 it is admitted that the structure of the dam was raised, and in 1852 changes were made which increased its power of retaining and throwing back the water. In 1866, when the bill was filed, the super-

structure consisted of a sill nine inches in height, on which were set posts twenty-one inches high, on which was placed a cap piece nine inches in height, and the space between the sill and cap piece was closed by solid planking at each end, and moveable gates in the intermediate space, thus making the efficient height of the superstructure above the stone wall, thirty-nine inches.   It was reduced nine inches in 1866, leaving its present height thirty inches, and the decree of the Chancellor directs a further reduction of twelve inches, reducing the height of the superstructure above the stone wall to eighteen inches, which consists of the height of the sill of nine inches, and the height of the sheathing and gates upon it of nine inches additional.   The effect of these operations will be to reduce the height of the dam, including the stone wall, sheathing, sill, and gates, to about what it was originally in 1828, including the stone wall, sill, and gates, which then made up the dam, but without taking into account the fact that the solid planking between the cap piece and the sill at each end, joined close up to the cap piece.

The principle of law stated by the Chancellor, that the extent of the right acquired by adverse user is not determined by the height of the structure, but is commensurate with the actual enjoyment of the easement, as evidenced by the extent to which the land of the owner of the servient tenement was habitually or usually flowed during the period of prescription, rests upon sound reasoning, and is supported by authority.  *Angell on Watercourses,* §§ 224, 379 ; *Burnham* v. *Kempton,* 44 *New Hamp. R.* 78.   The introduction into the rule requiring continuity of enjoyment to acquire a prescriptive right, of the qualification of habitual use, as applied to the effect of the structure, is the only qualification that is permissible where the easement is such that its enjoyment is profitable only from a continuous use, as an easement to overflow lands.

That the degree of flowage upon the lands of another fixes the extent of the right, is shown by a variety of cases.

The owner of the easement is not bound to use the water in the same manner, or to apply it to the same mill. He may make alterations or improvements at his pleasure, provided no prejudice thereby arises to the owner of the servient tenement, in the increase of the burden upon his land. *Luttrell's case*, 4 *Rep.* 87; *Sanders* v. *Norman*, 1 *B. & Ald.* 258. So it is not necessary that the dam should have been maintained for the whole period upon the same spot, if the extent of flowage is at all times the same. *Davis* v. *Brigham*, 29 *Maine* 391; *Stackpole* v. *Curtis*, 32 *Maine* 383. A change in the mode of use or the purpose for which it is used, or an increase in capacity of the machinery which is propelled by the water, will not affect the right, if the quantity used is not increased, and the change is not to the prejudice of others. *Angell on Watercourses*, §§ 228, 229, 230; *Hale* v. *Oldroyd*, 14 *M. & W.* 789; *Baxendale* v. *McMurray*, *L. R.* 2 *Ch. App.* 790; *Casler* v. *Shipman*, 35 *N. Y.* 533; *Whittier* v. *Cocheco Manufacturing Co.*, 9 *New Hamp. R.* 455; *Washb. on Easem.* 279, § 38; *Hulme* v. *Shreve*, 3 *Green's Ch.* 116.

The rule is clearly stated by Chancellor Green in the Holsman case, thus: " Where an action is brought for overflowing the plaintiff's lands by backwater from the defendant's mill dam, it establishes no title by adverse enjoyment, to prove that the defendant's mill has been in existence over twenty years, or that the dam has been in existence for that period. The question is not how high the dam is, but how high the water has been held, whether it has been held for twenty years so high as to affect the land of the plaintiff as injuriously as it did at the time the action was brought."

As a general rule, the height of the dam when in good repair and condition, including such parts and appendages as make its efficient height in its ordinary action and operation, fixes the extent of the right to flow, without regard to fluctuations in the flowage which are due to accidental causes, such as a want of the usual repairs, or the variation in the quantity of water in the stream in times of low

water or drought, or in the pondage of the dam by its being drawn down by use. *Washb. on Easem.* 105, § 54; *Cowell* v. *Thayer,* 5 *Metc.* 253; *Jackson* v. *Harrington,* 2 *Allen* 242; *Wood* v. *Kelly,* 30 *Maine* 47. But an user to be adverse must be under a claim of right, with such circumstances of notoriety as that the person against whom the right is exercised may be made aware of the fact, so as to enable him to resist the acquisition of such right before the period of prescription has elapsed. *Cobb* v. *Davenport,* 3 *Vroom* 369. Occasional use of flash boards for short periods, when little or no injury may be done, as an exception to the general rule not to keep them on, does not amount to the open, uninterrupted, and notorious adverse use necessary to establish a prescriptive right. *Pierce* v. *Travers,* 97 *Mass.* 306. If used for the full period of twenty years, only during times of low water, a prescriptive right will not be acquired thereby to keep the water up to the height of such boards during the whole year. *Marcly* v. *Shults,* 29 *N. Y.* 346. There may be such continuity of use of flash boards as that they in effect are part of the permanent structure, and by such user a right to flow by means of a permanent dam, to the height of such boards may be acquired. Whether the user has been such as to establish the right, is a question of fact for the jury. *Noyes* v. *Silliman,* 24 *Conn.* 15.

In the dam of 1828 there were two gates, each fourteen feet long, and the solid planking between the mud sill and the cap piece occupied four feet at each end. The difference between the superstructure of the dam of 1828, in its effect in flowing the lands of the complainants, and that ordered by the Chancellor in his decree, is quite inconsiderable. But with respect to the condition of the superstructure of the dam, and the mode of its use between 1828 and 1846, and from 1846 to 1853, there is great contrariety in the evidence. The conflict relates to the use of boards to close up the space between the top of the gates and the cap piece, thus making the top of the cap piece the line of the tumble; to

the washing away of the superstructure of 1828, and its being replaced by a structure of a different construction; to the use of gates of variable widths, and at time of nothing more than boards upon the sill, kept in place by pegs and starts. With this conflict in the evidence the case was submitted to the Chancellor on its merits.

The evidence touching the extent of the prescriptive right to flow the lands of the complainants by means of the permanent structure of the dam and moveable gates, and also to the use of flash boards, is reviewed by the Chancellor. His conclusion is, that there is not sufficient proof of an use of the flash boards in such a definite manner, or at certain fixed times or occasions, as to establish a qualified right to use them, when they operate to raise the water to any extent on the land of the complainants, and that the right to maintain the permanent structure of the dam, and to raise the water upon the complainants' lands by the use of the gates, is such as I have mentioned as the substance of the decree.

It is not proposed to examine the evidence in detail; a portion of it has been referred to by the Chancellor in his opinion. It is sufficient to say that his conclusions on all these points are supported by direct testimony, and are consistent with the collateral facts proved, and in my judgment are sustained by the weight of the evidence in the cause.

Objection was made to that portion of the decree which provided for the raising of the gates in times of freshets and high water. As the prescriptive right to the use or flow of water originates from its accustomed use, the right may be qualified as to times, seasons, and mode of enjoyment, by the character of the use from which the right has originated. *Angell on Watercourses*, §§ 382, 222, 224; *Bolivar Manf. Co.* v. *Neponset Manf. Co.*, 16 *Pick*, 241; *Marcly* v. *Shults*, 29 *N. Y.* 346; *Burnham* v. *Kempton*, 44 *New Hamp. R.* 78. Prescriptions may be upon condition in restraint of the mode in which the prescriptive right is to be enjoyed, or may have annexed to them a duty to be performed for the

benefit of the person against whom the prescription exists. *Kenchon* v. *Knight*, 1 *Wils.* 253; *S. C.*, 1 *W. Bl.* 49; *Brook* v. *Willett*, 2 *H. Black.* 224; *Gray's Case*, 5 *Rep.* 79; *Lovelace* v. *Reynolds*, *Cro. Eliz.* 546, 563; *Colton* v. *Smith*, *Cowp.* 47; *Paddock* v. *Forrester*, 3 *Man. & G.* 903.

In the lease to Thompson for the year 1829, the defendant inserted a covenant requiring the tenant to hoist the gates in time of high water, if need be, so that no damage should be done. Similar covenants are contained in subsequent leases, and the evidence is, that it was the uniform practice of the tenants in the use of the dam and its appendages, to control the height of the water in the pond in times of high water, by raising the gates and permitting it to flow off. Like the use of flash boards, only in times of low water, this mode of user qualifies the right which the defendant acquired from user, and the portion of the decree which regulates the management of the gates, is necessary to restrain the flowage of the complainants' lands to what it was accustomed to be during the time of prescription.

In *Robinson* v. *Byron*, the injunction was to restrain the defendant from using dams, weirs, shuttles, flood gates, or other erections, otherwise than he had done before the 4th of April, 1785, so as to prevent the water flowing to the complainant's mill in such regular quantities as it had ordinarily done before the said 4th of April. 1 *Brown's C. C.* 588. A decree of a like nature was made by Lord Eldon, in *Lane* v. *Newdigate*, 10 *Ves.* 192.

The decree, by its reference to the cap piece as fixing the extreme height to which the water may be raised by the use of the gates when shut, is probably more specific in its direction than is usual; but it removes all uncertainty in the adjudication of the court as to the extent of the rights of the respective parties. The complaint that the exercise of the defendant's right to the water is thereby made impracticable, is without foundation. That it might be more conveniently exercised if his right was enlarged, is no reason why it should be enlarged by the sacrifice of the rights of the complainants without compensation.

The objection that the decree fixes the form and construction of the dam perpetually, seems to me to be of greater force. The expression in the decree on which this objection is founded, was probably used through inadvertence. Let the decree be amended by declaring the defendant's rights, as therein in substance declared; and directing the abatement of so much of the present dam as the Chancellor has declared to be unlawful.

The plea of the complainants is based on the allegation that the stone work of the dam was raised by the defendant in 1846. The Chancellor decides that it was not, and he is supported in this by the clear weight of the evidence.

With the exception of the formal modification above mentioned, the decree is affirmed in all respects. Both parties having appealed, and neither party succeeding on the appeal, the affirmance is without costs to either in this court.

The decree was affirmed by the following vote :

*For affirmance*—BEDLE, CLEMENT, DEPUE, OGDEN, SCUDDER, VAN SYCKEL, WALES, WOODHULL. 8.

*For reversal*—VAIL.